UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

HVLPO2, LLC,

    *Plaintiff*,

v.                                            Case No. 4:16cv336-MW/CAS

OXYGEN FROG, LLC, and
SCOTT D. FLEISCHMAN,

    *Defendants.*

_____/

**ORDER GRANTING PARTIAL SUMMARY JUDGMENT**

Plaintiff owns the rights to several patents in the field of oxygen generation. *See* ECF No. 11. Plaintiff now moves for partial summary judgment on the issue of whether Defendant Oxygen Frog, LLC, has infringed some of the claims in those patents.[1] *See* ECF No. 70. For the reasons that follow, Plaintiff's motion is **GRANTED**.

---

[1] There are presently two defendants in this case: Oxygen Frog, LLC, and Mr. Scott Fleischman. *See* ECF No. 11. In its reply in support of summary judgment, Plaintiff stated that "summary judgment of infringement against Mr. Fleischman individually is not warranted at this time." ECF No. 85, at 12. Accordingly, this order does not address whether Mr. Fleischman has infringed Plaintiff's patents.

I. *Background*

A. Plaintiff and its Patents

Plaintiff is a company based in Lincoln, Nebraska. ECF No. 11, at 1. It was founded by Marc Kornbluh and his wife Deni sometime in 2011.[2]

In early 2012, Mr. Kornbluh and two other inventors jointly submitted provisional-patent application 61/583,051 ("the application") to the United States Patent and Trademark Office. The application explained that the three inventors are "torch glass artists" (a.k.a. glass blowers) and need "a constant supply of fairly pure oxygen" for their work. ECF No. 48-1, at 1. According to the application, the most common source of oxygen for glass blowers is from pre-filled tanks rented from local distributors. *Id.* These tanks can run out of oxygen "within a day or even a few hours depending on the project" and come with many disadvantages, such as "storage hazards, availability, and the frustration of waiting for shipments or running out mid-project." *Id.*

Aside from using pre-filled tanks, another method of obtaining oxygen is to use oxygen concentrators (a.k.a. oxygen

---

[2] *See* High Volume O$_2$, *Meet the Team*, highvolumeoxygen.com, https://www.highvolumeoxygen.com/hvo-team/ [https://perma.cc/RK9T-P4VP].

generators). *See id.* These generators extract oxygen from the air, providing an essentially unlimited supply of high-purity oxygen. *See* ECF No. 70-6, at 6. At the time of the application, however, the only commercially available oxygen generators that could meet the inventors' needs were "larger system[s] bought by hospitals and universities at $20,000 and up." ECF 48-1, at 2. Mr. Kornbluh and his co-inventors wanted an option that was cheaper and more suitable for the smaller-scale operations typical of most glass blowers. *See id.* Accordingly, they proposed a solution combining medical oxygen generators (which are smaller and cheaper than their industrial counterparts), an oil-less compressor, a storage tank, and pressure switches. *See id.* at 2–13. The idea was relatively simple; namely, link together enough oxygen generators to provide the requisite flow of oxygen, compress the oxygen so that it reaches the appropriate pressure, store the pressurized oxygen in a tank, and use pressure switches to turn the components on or off in a coordinated fashion when the tank nears full or empty. *See id.* Finally, because the system involves several power-hungry components, it would have to run on multiple electrical circuits to avoid blowing a typical residential fuse. *Id.* at 7–8.

Mr. Kornbluh's application eventually led to a number of issued patents, specifically: U.S. Patent Nos. 8,876,941 ("the '941 patent") and 9,372,488 ("the '488 patent"), which were then assigned to Plaintiff.[3] *See* ECF No. 11-2; ECF No. 11-26. One of the drawings featured in the patents, Figure 1A, is reproduced below to help explain the nature of Plaintiff's patents:



ECF No. 11-26, at 3.

According to the patents, Figure 1A depicts "an embodiment of an oxygen generating system." *See, e.g.*, *id.* at 20. The boxes marked 141 through 146 represent oxygen generators. *Id.* at 21.

---

[3] Plaintiff was also assigned U.S. Patent Nos. 8,702,840 and 9,139,434. *See* ECF No. 11-1; ECF No. 11-23. Plaintiff is suing Defendants for infringing those patents too, *see* ECF No. 11, but those patents are not at issue in Plaintiff's motion for summary judgment, ECF No. 70.

4

Oxygen passes from the generators through a series of pipes (151 and 153) and then through a manifold (155) into a single output. *See id.* The single oxygen output (157) goes into the control box (111), which may contain a compressor, a controller device, and power relays. *Id.* The oxygen generators are powered through cables (117) that are plugged into the control box. *Id.* The control box has two power plugs (101 and 103) so that it can run on two circuits. *Id.* The oxygen passes from the control box (where it may be compressed) to a storage tank (121) and is eventually outputted to a glassblowing torch (135). *Id.* The controller device in the control box may control the power to individual components or to the system as a whole. *See id.*

B. <u>Defendant and its Products</u>

Defendant Oxygen Frog, LLC, ("Oxygen Frog") is a company based in Tallahassee, Florida. ECF No. 11, at 2; ECF No. 14, at 1. Over the years, Oxygen Frog has produced and sold a number of products in the field of oxygen generation. *See* ECF No. 70-6, at 12–13, 16–17. One of the first things Oxygen Frog sold was a pressure controller called the OxygenFrog. *Id.* Basically, the OxygenFrog was "just [a] relay box with a pressure switch on it." *Id.* at 12. More specifically, the box ran on two circuits, had several

5

outlets for oxygen generators and a compressor to be plugged into, and had a pressure switch that could turn the system on or off when certain pressure setpoints were reached. *See* ECF No. 70-8, at 10–17. A mock oxygen-generation system incorporating the OxygenFrog (which is in green), can be seen in following picture:



4

---

[4] This picture was taken by the Court on March 2, 2018, at the United States District Courthouse in Tallahassee, Florida, shortly before a hearing scheduled in this case later that day. Plaintiff brought the OxygenFrog to the hearing and set it up in the courtroom for demonstrative purposes. The three cubes on the left side of the table represent oxygen generators. The object to

Sometime later, Oxygen Frog began selling its own compressor called the HPC or HPC I. ECF No. 70-6, at 12–13, 16. More recently, Oxygen Frog began selling an upgraded product called the HPC II. *See id.* The HPC II "is essentially the original OxygenFrog control box and the HPC I in a single box." *Id.* at 16. In other words, the HPC II is "like an all-in-one unit." *Id.* The frontside of an HPC II can be seen in the following picture:

---

the right of the OxygenFrog is an oil-less compressor. A law clerk (standing roughly six feet tall) is included to provide a sense of scale.



5

## II. *Analysis*

Plaintiff argues that Oxygen Frog infringed claims 1 and 7 of the '941 patent and claims 1 and 7 of the '488 patent. ECF No. 70. "Infringement analysis involves a two-step process: the court first determines the meaning of disputed claim terms and then compares the accused device to the claims as construed." *Wavetronix LLC v. EIS Elec. Integrated Sys.*, 573 F.3d 1343, 1354

---

[5] This picture was taken from Oxygen Frog's website. *See* Oxygen Frog, *HPCII Compressor / Controller*, oxygenfrog.com, https://oxygenfrog.com/hpcii [https://perma.cc/T9TX-4X9Q].

8

(Fed. Cir. 2009). "Literal infringement of a claim exists when every limitation recited in the claim is found in the accused device, i.e., when the properly construed claim reads on the accused device exactly." *Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 532 (Fed. Cir. 1996). This Court has already construed the claims at issue to the extent construction was necessary. *See* ECF No. 104. Accordingly, the only thing left to do is compare the claims to Oxygen Frog's products.

Claim 1 of the '488 patent reads as follows:

An apparatus for managing an oxygen generating system, the oxygen generating system configured for supplying a sustained flow of a gaseous mixture comprising mostly oxygen, the apparatus comprising:
  a controller device configured to:
    receive a first pressure signal associated with a first pressure;
    determine the first pressure to be less than or equal to a startup threshold pressure, said first pressure associated with a gaseous pressure of an oil-less tank;
    send a signal to switch a first circuit on, said first circuit for providing electrical power to a bank of at least two oxygen generators;
    send a signal to switch a second circuit on, said second circuit for providing electrical power to an oil-less air compressor;
    receive a second pressure signal associated with a second pressure;
    determine the second pressure to be greater than or equal to a shutoff threshold pressure, said second pressure associated with a gaseous pressure of the oil-less tank;

9

>   send a signal to switch the first circuit off; and
>   send a signal to switch the second circuit off.

ECF No. 11-26, at 27.

Both the original OxygenFrog controller and the new HPC II contain all of the limitations recited in Claim 1 of the '488 patent. That is, both products are apparatuses for managing oxygen-generating systems,[6] both are controller devices,[7] and both are configured to perform the steps recited in the claim.[8]

Claim 7 of the '488 patent reads as follows:

> An apparatus for managing an oxygen generating system, wherein the oxygen generating system includes an oxygen storage tank, a compressor, and at least one group of at least two oxygen generators, the oxygen generating system configured for supplying a sustained flow of a gaseous mixture comprising mostly oxygen, the apparatus comprising:
>   a controller device configured to:

---

[6] *See, e.g.*, ECF No. 70-8, at 1 ("The OxygenFrog HPC II is a high performance compressor *designed specifically for use with OxygenFrog on-demand oxygen systems*." (emphasis added)); *see also id.* at 10 ("Using the OxygenFrog for oxygen system management is a simple and straightforward process.").

[7] *See, e.g.*, ECF No. 70-8 at 10 ("The OxygenFrog controls and provides power to the concentrators and compressor according to user programmed pressure setpoints."); ECF No. 70-6, at 16 ("The HPC II is essentially the original Oxygen Frog control box and the HPC I in a single box.").

[8] *See generally* ECF No. 70-8 (describing how the HPC II and the OxygenFrog manage multiple circuits by turning them on or off depending on pressure setpoints); *see also* ECF No. 70-6, at 16–18, 24 (describing how the HPC II works); ECF No. 84-2, at 9 (same); ECF No. 1-4 (screenshot of Oxygen Frog's website describing the original OxygenFrog controller).

> control at least one group circuit based at least upon a pressure of the oxygen storage tank, each of the at least one group circuit for providing power to a particular group of the at least one group of at least two oxygen generators; and
> control a circuit for providing power to the compressor.

ECF No. 11-26, at 27.

Again, both the original OxygenFrog controller and the new HPC II contain all of the limitations recited in Claim 7 of the '488 patent. That is, both products are apparatuses for managing oxygen-generating systems, both are controller devices, and both are configured to perform the steps recited in the claim. *See supra* notes 6–8. The same goes for Claims 1 and 7 of the '941 patent, which are nearly identical to Claims 1 and 7 of the '488 patent except for being worded as method claims. *See* ECF No. 1-2, at 27.

Defendants have only offered two counterarguments in response to Plaintiff's assertions of infringement. First, Defendants argued that the claims at issue require the compressor to be on its own circuit (i.e., separate from any other components) and that since the HPC II has a compressor on the same circuit as

11

other components the HPC II does not infringe.[9] But this Court concluded that the claims <u>do not</u> require the compressor to be on its own circuit;[10] accordingly, Defendants' first argument fails. Second, Defendants argued that the claims at issue require a "smart" controller that can turn individual components on and off independently and that since Defendants' products do not control components individually they do not infringe. *See* ECF No. 79, at 10–12; *see also* ECF No. 70-6, at 23. However, this Court concluded that the claims <u>do not</u> require a smart controller, *see* ECF No. 104, at 8; accordingly, Defendant's second argument fails too.

Having determined that the OxygenFrog and HPC II literally infringe on the claims at issue, this Court next considers whether Plaintiff has met the requirements of 35 U.S.C. § 271(a). That section provides that "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the

---

[9] Mr. Fleischman made this argument at his deposition. *See* ECF No. 70-6, at 26. Defense counsel made the same argument at the March 2, 2018 hearing. Moreover, Defendants seem to make this argument in their response to Plaintiff's motion for summary judgment. *See* ECF No. 79, at 4.

[10] *See* ECF No. 104, at 8 ("Claim 7 of both patents involves a system with at least two electric circuits. Although one of those circuits is 'for providing power to the compressor,' that circuit may also have additional components on it."). To be clear, the above-cited construction applies equally to Claim 1 of both the '488 and '941 patents. When this Court drafted its claim-construction order, it believed that Defendants were only making the argument as to Claim 7.

United States or imports into the United States any patented invention during the term of the patent therefore, infringes the patent." 35 U.S.C. § 271(a). There is no dispute that Oxygen Frog has made, used, offered to sell, and sold the OxygenFrog and the HPC II in the United States during the term of Plaintiff's patents. *See* ECF No. 11, at 17–18; ECF No. 14, at 1; *see also* ECF No. 70-6, at 12–13, 16–17. Accordingly, Oxygen Frog has infringed the apparatus claims at issue, i.e., Claims 1 and 7 of the '488 patent.

As far as the method claims (i.e., Claims 1 and 7 of the '941 patent), simply making, selling, or offering for sale a product is not enough. *See Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed. Cir. 1993) ("The law is unequivocal that the sale of equipment to perform a process is not a sale of the process within the meaning of section 271(a)."). "Direct infringement under § 271(a) occurs where all steps of a claimed method are *performed by* or *attributable to* a single entity." *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir. 2015) (en banc) (emphasis added). Oxygen Frog has admitted to using the OxygenFrog. *See* ECF No. 11, at 17–18; ECF No. 14, at 1. Oxygen Frog has similarly admitted to providing, installing, and demonstrating the OxygenFrog at a store in Tallahassee. *See* ECF

13

No. 11, at 22–23; ECF No. 14, at 1. Accordingly, whether by its own use, or whether by a performance attributable to it, there is no genuine dispute that Oxygen Frog has infringed Claims 1 and 7 of the '941 patent. *Cf., e.g.*, *Suprema, Inc. v. Int'l Trade Comm'n*, 796 F.3d 1338, 1356 (Fed. Cir. 2015) (O'Malley, J., dissenting, joined by Prost, C.J., and Lourie and Dyk, JJ.) ("We have long held that 'use' in § 271(a) covers infringement of method claims."); *Akamai*, 797 F.3d at 1022 (holding than "an entity [is] responsible for others' performance of method steps . . . where that entity directs or controls others' performance").

### III. *Conclusion*

"Summary judgment on the issue of infringement is proper when no reasonable jury could find that every limitation recited in a properly construed claim either is or is not found in the accused device . . . ." *PC Connector Sols. LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1364 (Fed. Cir. 2005). Here, the only reasonable conclusion that can be drawn from the undisputed facts is that every limitation found in Claims 1 and 7 of the '941 and '488 patents is found in the OxygenFrog and the HPC II. That is, no reasonable jury could find that Oxygen Frog has not infringed the claims at

issue. As such, Plaintiff is entitled to partial summary judgment on the issue of infringement.[11]

Accordingly,

**IT IS ORDERED:**

1. Plaintiff's motion for partial summary judgment, ECF No. 70, is **GRANTED**.

2. This Court does not direct partial entry of judgment pursuant to Federal Rule of Civil Procedure 54(b).

3. The Clerk shall set a telephonic scheduling conference to reset this case for trial.

**SO ORDERED on March 18, 2018.**

          <u>s/Mark E. Walker   </u>
          **United States District Judge**

---

[11] It is important to note that this Court's holding does not mean Oxygen Frog is *liable* for infringement. "[A] court in a patent action may grant summary judgment on the question of infringement yet reserve other issues—such as validity of the patent or damages—for trial." *Al-Site Corp. v. Opti-Ray, Inc.*, No. CV-91-1770, 1992 WL 209330, at *2 (E.D.N.Y. May 26, 1992). *See also Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563, 1583 (Fed. Cir. 1983) ("Though an invalid claim cannot give rise to liability for infringement, whether it is infringed is an entirely separate question capable of determination without regard to its validity.").